IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of<br><br>N.B.G. and A.R.G. | No. 85642-1-I<br><br>DIVISION ONE<br><br>ORDER GRANTING MOTION<br>TO PUBLISH |

Respondent, Department of Children, Youth, and Families, moved for publication of the opinion filed on May 20, 2024. Appellant, B.G., filed an answer to the motion in opposition of publication. A panel of the court has considered the motion and has determined that the motion to publish should be granted.

Now, therefore, it is hereby

ORDERED that the motion to publish is granted.

Díaz, J.

Chung, J.

Dwyer, J.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of N.B.G. and A.R.G. | No. 85642-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

DíAZ, J. — B.G. appeals an order terminating his parental rights as to N.B.G. and A.R.G. He argues insufficient evidence supported the court's two findings that, under RCW 13.34.180(1)(f), there was no "available" guardian in lieu of termination, and that the Department of Children, Youth, and Families (the Department) had met its obligation to make efforts to support such a guardianship. He also argues the court's order directing the Department to initiate termination contravened the separation of powers doctrine, and was lacking in other ways. We affirm the superior court's order.

## I.    BACKGROUND

B.G. is the father of two children, N.B.G. and A.R.G.[1]  N.B.G. was born in

---

[1] We refer to the parties and stakeholders by their initials to protect their privacy.

2014 and A.R.G. was born in 2016. The Department filed a petition for order of dependency in March 2019, which was granted in May 2019.

During this time, B.G. asked the Department to place his children with S.G., then left them with her, and did not return for at least the subsequent six months. The court formally placed the children, and they have resided, with S.G. since then. As we discuss in more detail below, S.G. had a prior quasi-familial relationship with B.G. and the children.

In April 2020, the Department petitioned for termination of B.G.'s parental rights as to A.R.G. and N.B.G.[2] The trial court held a two-day trial, during which it heard from eight witnesses including the Department social workers assigned to the dependency, mental health and substance abuse treatment professionals assigned to B.G., and from S.G. B.G.'s counsel notified him of the hearing, but he was not present.

As we also will discuss in more detail below, the trial court heard testimony that the Department and S.G. discussed the possibility of S.G. serving as the children's guardian. Ultimately, the court held that S.G. was not an available guardian, finding that:

> [S.G.] was unequivocal in explaining that there were no barriers [to guardianship] that could be overcome because she was choosing to adopt the children rather than to be established as their guardian.

The trial court then granted the Department's order of termination, finding:

> The fact that that this child has been in the care of [S.G.], the current caregiver, for over four years and that there was a pre-existing

---

[2] Contemporaneously, the trial court terminated the children's mother's parental rights by entering a default judgment when she failed to appear to defend the State's petition for termination.

relationship between [B.G.] and [S.G.] compels the court to find that RCW 13.34.180(1)(f) has been proven by clear cogent and convincing evidence . . . .

The court is required to consider whether guardianship is available as an option and finds that in this case, it is not available because there is no willing guardian. Further, the court finds that the Department has made adequate efforts to overcome any barriers that the caregiver has that prevent establishment of a guardianship.

B.G. appeals.

## II. ANALYSIS

### A. Whether the Court Complied with RCW 13.34.180(1)(f)

#### 1. Pertinent Legal Background on Terminations and Our Standard of Review

"Chapter 13.34 RCW creates a two-step framework for terminating parental rights. First, the Department must show that it satisfied its statutory obligations under the six elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence, and then it must establish that termination of parental rights would be in the child's best interest by a preponderance of the evidence." Matter of Dependency of G.C.B., 28 Wn. App. 2d 157, 171, 535 P.3d 451 (2023). B.G. challenges only the sixth element of the first step of the framework here, i.e., RCW 13.34.180(1)*(f)*. Br. of App. at 3-4 & 24.

"Under RCW 13.34.180(1)(f), the Department must show that 'continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.'" Id. (quoting RCW 13.34.180(1)(f)). As an "alternative" to the discontinuation of that relationship, dependency guardianships were created to inject "a measure of flexibility . . . to allow the State to provide permanence for a child without terminating the parent's rights . . . while

authorizing both visitation between parent and child and continuing involvement by state agencies." In re Dependency of A.C., 123 Wn. App. 244, 251, 98 P.3d 89 (2004). "Whether guardianship is a viable alternative to termination is a case-specific determination, considering factors relevant to the best interests of the child." G.C.B., 28 Wn. App. 2d at 173. "And even when an identified guardianship is available, 'there will be circumstances under which termination, rather than guardianship, is the appropriate course of action.'" Id. at 174 (quoting In re Welfare of R.H., 176 Wn. App. 419, 429, 309 P.3d 620 (2013)).

In 2022, the Washington legislature amended RCW 13.34.180(1)(f) to require the trial court to *consider* the (1) whether a guardianship is available as a permanent option and (2) the Department's efforts to support a guardianship, in resolving the Department's petition. LAWS OF 2022, ch. 127, § 2. However, we have also "held that the Department need not *disprove* the availability of a guardianship placement to satisfy its burden" under the statute, holding instead that

> The 2022 amendment to RCW 13.34.180(1)(f) . . . ensures due consideration of a guardianship by requiring the court to *contemplate* whether a viable guardianship option exists when assessing whether the Department has met its burden under RCW 13.34.180(1)(f). And it reinforces the trial court's authority to reject termination of parental rights should it conclude the Department has not adequately explored a viable guardianship option.

G.C.B., 28 Wn. App. 2d at 173-74 (emphasis added).

We review issues of statutory interpretation de novo. Id. at 171. "Our goal is to give effect to the legislature's intent." Id. We first look to the plain meaning of a statute as an expression of its intent. Id. If the language is plain and

4

unambiguous, our inquiry ends.  Id.

As to issues of fact, "[o]ur role in reviewing a trial court's decision to terminate parental rights is limited to assessing whether substantial evidence supports the trial court's findings."  Matter of D.H., 195 Wn.2d 710, 718, 464 P.3d 215 (2020).  We do not disturb the trial court's findings "unless there is an absence of clear, cogent, and convincing evidence in the record.  We defer to the trial court's weighing of the evidence and witness credibility determinations."  Id.

2.  Discussion

B.G. argues that the trial court erred by holding the Department met its burden under RCW 13.34.180(1)(f), first, when it found that S.G. was not available to serve as a guardian.  Specifically, B.G. insists that S.G. *was* an available guardian because she effectively had served and was willing to continue to serve in that role at least as a matter of last resort, thus making her "willing and able" to fulfil the duties of a guardian.[3]

Second, B.G. argues that S.G. "mistakenly believed adoption is more permanent than a guardianship."  And B.G. further suggests that because the

---

[3] In its briefing and at oral argument, counsel for B.G. asks us to define the term "available" pursuant to RCW 13.36.040(2)(b), where the court may establish a guardianship by stipulation if "the proposed guardian is qualified, appropriate, and capable of performing the duties of a guardian under RCW 13.36.050." Wash. Ct. of Appeals oral argument, In the Matter of the Dependency of N.B.G. and A.R.G., No. 85642-1-I (April 10, 2024), at 2 min., 16 sec. through 2 min., 43 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2024041136/?eventID=2024041136. There is no dispute here that S.G. is qualified and capable.  The question then boils down to whether a guardian can be "appropriate" were she found to be unwilling.  Thus, the definition does not do much to illuminate or advance the resolution of this matter.  The question still is whether S.G. was willing and thus available.

Department did not disabuse her of that alleged misperception, it failed to make adequate efforts to support a guardianship in lieu of termination. We address each argument in turn.

    a.  <u>Was S.G. an Available Guardian?</u>

As to whether S.G. was an "available" guardian, additional factual background is necessary. B.G. had known S.G. for many years. B.G. first met S.G. through her eldest son, and starting when he was 15 years old he lived with her family for three years until he turned 18. B.G. often stayed with S.G. even after N.B.G. and A.R.G. were born, and S.G. was present at both of their births. S.G. described serving in a "mothering" or grandmother role for the children before they formally were placed with her. And, later, when the court declared the children dependent, B.G. asked the court to place them with S.G.

In late 2019, B.G. asked if he could leave the children with S.G. while he "cleared up some legal matters," and then he did not return. S.G. thought he would return until approximately six months had passed. During this time, S.G. assumed full responsibility for the children including their education, basic necessities, and mental health support for N.B.G.

Most relevantly, S.G. testified that she did not want to serve as a guardian because she wanted to adopt the children:

> I would tell [the Department] that I don't want the girls ripped away from me and, um, for my guardianship to be terminated. I wanted to adopt to make sure that they could be successful and safe, stable and being healthy.

When B.G.'s counsel asked S.G., on cross-examination, what barriers prevented her from serving as a guardian, S.G. explained:

> I believe from personal experience that guardianship is temporary, um, and I don't want the girls to be taken away from me *at any given point*. Um, it would be very heartbreaking for me and I think for the girls and so I think adoption is ideal in our family.

(emphasis added).

In summary, the trial court heard S.G. and others testify that B.G. was an inconsistent presence in the lives of N.B.G. and A.R.G., while S.G. has been a maternal figure since birth and had created a "family." And the court heard testimony that S.G. believed adoption was preferable because she wanted certainty—for the girls' and family's sake—that neither B.G. or anyone else would disturb their life with her.

RCW 13.34.180(1)(f) does not define when a "guardianship is available as a permanent option for the child." G.C.B. is instructive and nearly on point. There, the trial court heard testimony that:

> the current caregiver to both children testified that her family "discussed the potential for guardianship or adoption with the Department." She said that her family preferred adoption and that their home had already "been approved for adoption."

G.C.B., 28 Wn. App. 2d at 175.

Further, the trial court heard testimony there that "the children were thriving in their current placement, and a guardianship would keep them 'in limbo' with negative 'consequences.'" Id. at 174. This court affirmed the trial court's termination, holding that "[s]ubstantial evidence supports the trial court's findings that the children's caregivers were 'not interested' in being guardians and that a guardianship would diminish the children's integration into a stable and permanent home. Id. at 175.

7

Here, we conclude there is substantial evidence per above that S.G. similarly preferred adoption and, in turn, was not interested in being a guardian because she wanted certainty the children would continue to be in the "successful and safe, stable and . . . healthy" family they had created. Under G.C.B. that is sufficient.

In response, B.G. avers that, even if she preferred adoption, S.G. admitted she would serve as a guardian if there were no other option, thereby making her a willing guardian under RCW 13.34.180(1)(f).

In fact, S.G. was asked:

Q. If [B.G.] were more involved you might be open to a guardianship?

A. It's *possible*. . . .

Q.: So, *hypothetically*, if the department had a family that was open to guardianship, would you give up placement of the girls rather than agree to a guardianship?

A. I would not give up the girls, no. . . .

Q. And were you open to, even if adoption were agreed to, were you open to future contact between [B.G.] and the girls in a limited way?

A. It's *possible*.

(Emphasis added).[4]

When read in its full context, counsel for B.G. merely asked S.G. counter-factual questions about circumstances in which S.G. may be open to guardianship

---

[4] At oral argument, B.G.'s counsel asserted that this testimony and similar testimony by the Department's social worker were his best evidence that S.G. would be willing to serve as a guardian if compelled to do so and thus, was "available." Wash. Ct. of Appeals oral argument, supra at 7 min., and 24 sec. through 7 min., 55 sec.

or simply further involvement with B.G. And even then, S.G. answered quite conditionally, and firmly and only negatively as to the crucial question whether she was willing to part with the children. At no time did S.G. testify, as B.G. claims, that "she would agree to a guardianship if it were the only way she could have custody of the children." The predicate of B.G.'s argument fails.

Moreover, the trial court interpreted her testimony as S.G. being willing, not to "agree," but to capitulate to serve as a guardian only if compelled, holding that "the caregiver cannot be coerced to agree to guardianship at the risk of losing placement of the child."

The question before us, as in G.C.B., is whether the court's finding that SG was "unwilling," and thus not available, is supported by substantial evidence. We conclude it is. Based on the testimony described above, the trial court reasonably determined S.G. was willing to serve guardian only if coerced. And "[b]ecause of the fact-specific nature of termination proceedings, deference to the trial court is particularly important." G.C.B., 28 Wn. App. 2d at 171. In other words, we hold that there was substantial evidence that S.G. would serve only if coerced, and that therefore she was unwilling, and thus unavailable, to serve as guardian.

Finally, as the trial court rightly suggests, nothing in the statute requires the trial court to compel S.G. to serve as a guardian if she does not want to. At a minimum, a rational person could conclude that, because a coerced guardian is no guardian at all, S.G. was unavailable as a guardian. G.C.B., 28 Wn. App.2d at 170-71.

b. Did the Department Make Adequate Efforts to Support a Guardianship?

9

Second, as to whether the trial court properly considered the efforts by the Department to obtain guardianship for the children, and based its findings thereto on substantial evidence, additional factual background is warranted. Several social workers and Department staff testified that they explained to S.G. several times that she could serve as the children's guardian.

S.G. estimated they had five such conversations. For example, Michael Justin, a Department social services specialist, testified he explained the concept of guardianship to S.G.:

> I believe that I discussed that with her when I originally provided her with the permanency planning matrix and she maintained then, ah, that she was not interested in a guardianship and that she would support adoption, that she was interested and available in adoption.
>
> And then earlier this month, um, I met again with [S.G.], um, and the issue of permanent plans for [A.R.G.] and [N.B.G.] were discussed to include guardianship and she expressed no interest in guardianship.
>
> Um, we know that the children had been in her care for 50 months, that they are well-established in her home. They are integrated into the family. She has raised those children and feels like those children are part of her family and wishes for that to be the permanent plan.

Additionally, Kristen Weg, the guardian ad litem, testified that several Department staff met with S.G. to discuss the possibility of guardianship, but ultimately S.G. and they agreed that adoption was preferable because:

> the girls need permanency. . . [T]hey are very sweet girls, very outgoing girls. [N.B.G.] especially wants to be in control of everything. She has no control over the situation. She has no control over when she has visits, when she does not, when the social workers come, when they do not, and it's very, um, disruptive for her to be . . . in this dependency indefinitely.

Again, RCW 13.34.180(1)(f) requires the trial court to "consider" efforts the

Department made to support a guardianship. In this case, the trial court considered the Department's efforts, presented through this testimony, and found that "the Department has made adequate efforts to overcome any barriers that the caregiver has that prevent establishment of a guardianship." We conclude that there is substantial evidence to support the court's findings.

In response, B.G. argues that the trial court erred because the Department did not disabuse S.G. of her belief that guardianship was not "permanent" or "as permanent" as an adoption, and in turn, she misunderstood this option.[5]

As a preliminary matter, we decline B.G.'s invitation to create an obligation on the Department to somehow ensure a potential guardian subjectively "grasp[s]" the arrangement or to "correct [any] misunderstanding." As in G.C.B., "the Department need not disprove" that a potential guardian was—in any possible way or any degree—confused about the arrangement "to satisfy its burden" under the statute to simply support the possibility of a guardianship. 28 Wn. App. 2d at 173. It is unclear to us how the Department could provide such assurance to a court of a person's mental state, if that were the standard.

More to the point here, again, we accord the trial court significant discretion as to its findings of fact. D.H., 195 Wn.2d at 718. Here, we conclude there was

---

[5] B.G. argues that "guardianship is every bit as much of a 'forever plan' as adoption." We need not and will not decide this issue, but there are several reasons to question whether guardianship, in some sense, is "as permanent" an option as adoption. For example, B.G. could petition the court to amend visitation or to dissolve the guardianship, which is not possible in a final adoption. See RCW 13.36.060; RCW 13.36.070(1). On the other hand, the statute requires the court to consider whether a guardianship is available "as a permanent option." RCW 13.34.180(1)(f). But again, we decline to reach this dispute.

substantial evidence to support the trial court's finding that the Department "supported" efforts to secure a guardianship when its staff explained the alternative to S.G. at least five times. And, we conclude such evidence is of "a sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise," i.e., that the Department made a satisfactory effort to secure guardianship before recommending termination. G.C.B., 28 Wn. App.2d at 170-71 (quoting In re Welfare of T.B., 150 Wn. App. 599, 607, 209 P.3d 497 (2009)).

B.      Findings for Each Individual Child

B.G. next argues that the trial court erred when it terminated B.G.'s parental rights because it made findings only for N.B.G. and not individually for A.R.G.

The trial court, in fact, issued two orders, one each for N.B.G. and for A.R.G. In the order for A.R.G., finding of fact 2.16 references N.B.G., when it clearly meant to reference A.R.G. We conclude this reference was a mere scrivener's error, which does not undermine the trial court's findings regarding A.R.G. Indeed, if the reference to N.B.G. were absent from the order regarding A.R.G., the order would reference, "the child" with A.R.G.'s name at the top of the document, making it clear the order was about her, specifically.

Additionally, we may affirm a trial court's findings on any grounds supported by the record. Johnson v. Liquor & Cannabis Bd., 197 Wn.2d 605, 611, 486 P.3d 125 (2021). In this case, we may infer from the record, based on the trial court's findings above, that the trial court intended to apply its findings equally to each child. And, that the trial court based its findings on the children's need for permanency and the Department's efforts to secure guardianship. Therefore, we

conclude the trial court did not err in its order terminating B.G.'s parental rights as to A.R.G.

## C.  Separation of Powers

Finally, B.G. argues that the juvenile court's order moving this matter from dependency to termination proceedings contravenes the separation of powers doctrine.  B.G. avers the Department expressly ordered the Department to file a petition to terminate B.G.'s rights.  Additionally, B.G. suggests the termination statute itself violates the separation of powers doctrine, when it requires the court to direct the Department's actions; specifically, where "[t]he dependency statute provides the court 'shall' order the Department to file a termination petition if the child was outside the home for 15 of the last 22 months and no good-cause exception applies."  (Quoting RCW 13.34.136(3); RCW 13.34.145(5)).

We need not reach the latter argument because the language of the order the court issued was not mandatory.  That is, contrary to B.G.'s argument, the trial court order did not *require* the Department to file a termination petition, but rather stated that "DCYF *should* file a termination petition pursuant to RCW 13.34.136(3)."  Therefore, in this particular circumstance, we conclude that the trial court did not actually order the Department to initiate any action because we read "should" as permissive and not as a directive.  C.f., e.g., Matter of K.J.B., 187 Wn.2d 592, 601, 387 P.3d 1072 (2017) ("It is well settled that the word 'shall' in a statute is presumptively imperative and operates to create a duty, rather than to confer discretion.").  Thus, the trial court's order does not implicate the separation of powers doctrine.

### III.  CONCLUSION

We affirm the superior court.

Díaz, J.

WE CONCUR:

Chung, J.

Dwyer, J.