# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

|  |  |
|---|---|
| In the Matter of the Parental Rights to<br><br>C.J-L.H. and P-J.B.H., aka B.B.M. | No. 86517-0-I<br>(consolidated with<br>Nos. 86518-8-I, 86531-5-I,<br>86532-3-I)<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

BIRK, J. — In 2024, the court terminated the parental rights of M.M., the mother, and J.H., the father, to their children C.J.H. and P.J.H. In the dependency proceedings preceding termination, both parents unsuccessfully attempted to treat their substance use issues. Both parents assert the Department of Children, Youth, and Families (DCYF) failed to offer all necessary mental health services. J.H. also challenges the court's findings on his current parental unfitness, guardianship, and whether termination was in the children's best interests. We affirm the court's termination order as to both parents.

I

M.M. and J.H. have two children subject to the court order under review, their daughter C.J.H. and their son P.J.H.

A

In May 2019, within a week of C.J.H.'s birth, the court placed her in shelter care. With the exception of a brief period in the summer of 2019,[1] C.J.H. remained outside of the parents' custody until a trial return home in 2021. In July 2019 for M.M. and August 2019 for J.H., the court found C.J.H. to be dependent. The court found both parents had untreated substance use disorders requiring treatment. The court found M.M. "consistently used substances throughout her pregnancy" and C.J.H. "showed signs of withdrawal from Suboxone"[2] at birth.

In November 2020, within a week of P.J.H.'s birth, the court placed him in shelter care. P.J.H. also remained out of his parents' custody until the 2021 trial return home. In February 2021, the court found P.J.H. to be dependent as to both parents. The court found the "[h]ospital reported that [M.M.] and [P.J.H.] were both positive for opiates and amphetamines." The court found, based on the parties' agreement, that M.M. was in and J.H. had recently started chemical dependency treatment. The court ordered that M.M. continue in chemical dependency treatment, and the court ordered that J.H. complete a drug/alcohol evaluation and follow treatment recommendations.

---

[1] According to M.M.'s appellate brief, C.J.H. "was placed with MM at Mary's Place on July 1, 2019." "Sometime thereafter, however MM left Mary's Place with CH and could not be found for several months" and C.J.H. "was placed in licensed care thereafter."

[2] A clinical supervisor from "We Care Daily Clinic" testified at trial that Suboxone is a type of "opiate use disorder medication[]."

B

DCYF agrees that "[i]n the first year of dependency for [C.J.H.] and [P.J.H.], M.M. and J.H. complied with substance abuse treatment and completed negative urinalysis testing (UA) to show they were sober." At that time, both parents participated in intensive outpatient treatment at Sound Integrated Health. The court allowed a trial return home in 2021. During this trial return, the children lived with both parents at their maternal grandmother's apartment. The court required the parents to continue services during the trial return, including "Promoting First Relationships" (PFR) parenting classes and "conduct[ing] 90 days of [UAs]" of "one UA per week." Both parents also participated in "Homebuilders," a service that seeks to integrate children into the parents' home.

During the trial return home, both parents completed parenting evaluations. In March 2021, Dr. Dana Harmon completed his psychological evaluation of M.M., which included a parenting component. Dr. Harmon explained the aim of the evaluation was "testing both about cognitive functioning, reading, general mental status, mental health issues, and parenting factors." Dr. Harmon's report contained "two main findings." "One was drug problems; that drug addiction had been a long-standing, instructive part of [M.M.]'s life" and "continued to be very much a concern even though she was in early recovery at that point." Second, "there was a consistent pattern of—of avoidance and denial," which included "denying or minimizing problems" in what appeared to be "an emotional style of avoidance." Dr. Harmon indicated M.M. "seemed to be showing" "indications, signs" of "PTSD [posttraumatic stress disorder]."

In August 2021, Dr. Carmela Washington-Harvey completed a parenting evaluation of J.H. Dr. Washington-Harvey explained the purpose of the parenting evaluation was "to identify strengths and areas that might need improvement in the area of parenting." J.H. self-reported using "drugs for nonmedical purposes 60 days in the last six months." However, Dr. Washington-Harvey did not identify any "high-risk" factors for J.H., only a "borderline" high-risk factor for "empathy." Based on her direct observations of J.H. with his children, Dr. Washington-Harvey determined J.H. was "appropriate with his . . . children, and they . . . seemed to function well as a family." Dr. Washington-Harvey recommended J.H. "continue and complete his substance abuse program" as well as "services that were related to parenting," as "it is difficult to parent when you are not . . . clean and sober," which "is very detrimental to children," due to a lack of support, attention, and stability. She testified that children under five being raised by parents who actively use drugs can develop "attachment issues" and become "stinted in their development" among other harms.

C

In September 2021, the parents relapsed and the court removed both children from the trial return home. The court cited the parents' failure to comply with court-ordered services, such as the PFR classes and UA testing. In December 2021, the court placed C.J.H. and P.J.H. in the home of M.M.'s cousin and his wife, T.H. (caregivers). DCYF social worker Muriah Liu, who was the social worker from the time of the return home to June 2023, testified at trial on the placement process. Liu explained the children "were initially placed closer to the

4

parents . . . in foster homes." After these earlier foster homes were "not able to maintain placement that was in close proximity," DCYF sought out a new placement with relatives that would keep the siblings together. The caregivers' home satisfied both priorities. The children remained at the caregivers' home thereafter, over two years by the time of trial in January 2024.

The caregivers rejected guardianship despite at least two DCYF social workers promoting it and attempting to address their concerns. At trial, T.H. was asked if she was "interested in pursuing guardianship rather than adoption?" and testified, "I am not." She cited her personal experiences with guardianship for her refusal. She had had "five . . . foster sisters throughout [her] childhood growing up," "[o]ne of which we had permanent guardianship of through the tribe . . . [a]nd [the] other ones that have been adopted." She recounted "how confusing it was for her growing up in the guardianship process of just the back and forth" between relatives and how it was "very, very stressful for all of us to grow up." T.H. expressed worry about "the possibility of coming back to court and more—and more fight" and explained "the kids just need a consistent, stable place." The social workers "were not able to change [the caregivers'] mind[s]." Further, moving the children to another placement who may be amenable to guardianship "would not have been in the [children's] best interest" as "they had been with [the Caregivers] for almost two and a half years" and "they have a lot of stability . . . and consistency there."

D

After the trial return ended, the court allowed the parents three visits a week, each totaling three hours, at a "Department approved location."

Rachel Leskin, the visitation supervisor from May 2023 up until trial in January 2024, testified J.H. averaged two visits a month while M.M. participated in only two visits during that entire period of time. She agreed J.H. "would offer a reassurance that he would see [the children] at the next visit," but also that J.H. "only attended about 2 of every 12 visits that were available per month." T.H. testified the parents' participation had been "very minimal compared to what has been offered" with "no more than 30 visits a year in the last two years" with "up to five months with no contact, no visits." She sought a confirmation system where the parents would text both the night before and morning of a visit, because "there were times when the parents would provide confirmation the night before, but then would not appear for the visit the next day."

Liu summarized how the locations of these visits changed. "So in October of 2021, that was when we had requested they move to the community based on no-shows at the parents' homes—or home." "[T]hen I did a visit with [M.M.] at her home in January of 2022" but "it just never progressed because she didn't engage with me to schedule any further." "[T]hen in March of 2022—so basically in February 2022, I was able to, like, find the parents because I stopped by their home unannounced" and was able to "get them engaged in visits again in March." However, "it was in March of 2022 when I stopped by the home and had those concerns about any use happening in the home . . . based on the—the behavior I

was seeing." Even so, "visits started to happen again" and "were in [J.H.'s] home from August of 2022 until January 2023 . . . [a]nd then at that time we moved them to the community again based on concerns."

Liu also acknowledged that the parents' visits were more consistent when they occurred in the parental home. However, DCYF stopped visits at J.H.'s home "[a]fter several weeks of trying to address the . . . concerns that were being brought to our attention," namely the "smell of cigarette smoke in the father's home." Further, Liu states she observed "ashes on the coffee table," a "really strong chemically—chemical smell," and J.H. "zoning out when I was talking to him" after she "dropp[ed] by unannounced" to serve "termination paperwork for [P.J.H.]."

DCYF attempted to alleviate J.H.'s transportation concerns by providing ORCA cards,[3] gas vouchers, and offered to assist him with getting his driver's license abstract because DCYF could "potentially pay for those fees so he could get his license back, if that was the only thing hindering his license." Liu testified "we were also striving to alleviate the burden of transportation on [the parents and children] and have . . . a location that was equal distance from, like, [the caregivers] and the parents, for example."

Trial testimony from numerous witnesses indicated the parents' interactions with their children were generally positive. T.H. recounted J.H. provided food and outfits, a treatment provider from PFR observed J.H. redirect the children's

---

[3] "ORCA" stands for "One Regional Card for All," which is used to pay fares and transfer between different public transit systems throughout the Puget Sound region. *What is new with ORCA?*, FREQUENTLY ASKED QUESTIONS, ORCA, https://info.myorca.com/frequently-asked-questions/ (last visited Dec. 19, 2025).

behavior appropriately, the visitation supervisor noted the parents were prepared for visits by bringing food and toys, and Liu observed the parents use an appropriate amount of discipline and show love and care for their children.

E

At trial, DCYF presented evidence concerning the parents' engagement in substance use treatment after the end of the trial return home.

1

In fall 2021, J.H. reported and Liu verified that he started "medication-assisted treatment at Kent Treatment Solutions." J.H. participated in services at We Care, a "medicated assisted treatment program" for "opioid use disorder[s]," from approximately August 2022 to April 2023. His treatment provider stated that "[t]here was a couple of months where he was very engaged" but then his participation became "very hit and miss" before eventually they "couldn't get ahold of him" or "complete an individual session." By early 2023, J.H. requested that he be discharged from We Care. Despite attempts to convince J.H. to stay, the program granted his request.

As a result of a February 2023 evaluation at We Care, which recommended "long-term inpatient treatment," J.H. attended treatment at Key Recovery. J.H. left the program before completing it. Liu testified that "[J.H.] did not realize the program would be as extensive and as long as it was" and "he felt that he did not have everything set up with his housing." J.H. testified that "I didn't realize that was a place where children can actually be placed with you" and "if I'd have known that before, I would have . . . put my ducks in a row . . . to make up a plan . . . to

maybe possibly have my children and plan to go to that type of treatment facility." He testified, "I probably should have stayed there. It wasn't the best decision."

J.H. briefly attended services at Triumph Treatment Services at the James Oldham Treatment Center ("Triumph" or "JOTC) in June 2023. JOTC is located in Buena, Washington, about 20 miles from Yakima, Washington, and is an intensive inpatient facility which offers "chemical dependency counseling services" as well as "mental health counseling services." J.H. participated in a one-on-one intake appointment with a counselor where he disclosed he had been using methamphetamines for about eight years and fentanyl for about a year. J.H. testified he sought treatment because "he had tried off and on, occasionally on his own, and unfortunately had failed" to become sober. J.H. stated on "entering treatment that he had . . . lost a son." The JOTC counselor testified that they "offer mental health counseling for grief and loss."

However, on the Sunday following J.H.'s arrival at JOTC, he requested to leave the facility. The counselor reported J.H. was "very upset" and had stated "he was going to walk to Yakima." J.H. left the facility despite the counselor's attempts to "talk[] to [J.H.] about his reason why he was here," to discuss the risks of the Fentanyl epidemic, and to find transportation for J.H. At trial, J.H. said he left due to "food poisoning," which required hospitalization.

J.H. attempted at least two detoxification programs, though these services were unsuccessful. J.H. testified he had started dosing with We Care again by the time of trial.

9

2

When Liu assumed M.M.'s case in May 2021, she "attempted to assist [M.M.] in maintaining her services through Sound Integrated Health, where she had been receiving mental health counseling." "[A]fter [M.M.] was discharged from there . . . [Liu] provided her with information to Sea Mar Behavioral Health . . . and to Valley Cities." Liu "frequently would offer rides—or to give [M.M.] a ride to Valley Cities to do a walk-in mental health . . . assessment," which M.M. never fully agreed to. M.M. "participat[ed] in . . . a methadone program through Kent Treatment Services" in "fall of 2021," which Liu verified.

Liu referred M.M. to "parenting classes" with "Washington National Counseling for Promoting First Relationships" in September 2021. M.M. never fully engaged with the service.

M.M. began treatment at We Care after she completed an assessment in January 2023. After M.M.'s initial engagement in We Care services, M.M.'s participation became "sporadic[]." M.M. informed We Care staff that "her biggest barrier was getting there every day." We Care set up a transportation service to pick her up. However, the service was suspended as "after you miss a certain number of rides, you get suspended from transportation." Further, "multiple attempts to . . . ma[ke] phone calls to [M.M.] to reengage her in services" failed.

At the time of trial, the We Care counselor who worked with M.M. testified she was still on their active care list, and that M.M. had not attended an individual session with her since May 2023.

F

DCYF petitioned for termination of both parents' rights to both C.J.H. and P.J.H. For both children, DCYF primarily alleged the parents failed to sufficiently comply with treatment and remedy their substance use issues. The court entered rulings terminating the parental rights of J.H. and M.M. to both C.J.H. and P.J.H. In March 2024, the court issued its written findings of fact. M.M. and J.H. appeal.

II

Courts must be cognizant of a parent's " 'fundamental liberty interest in the care, custody, and management of their children.' " In re Parental Rights to M.A.S.C., 197 Wn.2d 685, 698, 486 P.3d 886 (2021) (quoting In re Welfare of D.E., 196 Wn.2d 92, 102, 469 P.3d 1163 (2020)). However, children have "fundamental rights at stake as well—the fundamental rights to health and safety, which the State, through [DCYF], has a compelling interest in protecting." In re Dependency of R.H., 129 Wn. App. 83, 88-89, 117 P.3d 1179 (2005) (footnotes omitted). Children have " 'a vital interest in preventing erroneous termination of their natural relationship' with their parents." M.A.S.C., 197 Wn.2d at 698 (internal quotation marks omitted) (quoting D.E., 196 Wn.2d at 103).

DCYF must satisfy a "two-step framework for terminating parental rights." In re Dependency of G.C.B., 28 Wn. App. 2d 157, 171, 535 P.3d 451 (2023). For this framework, " 'the burden of proof in a termination trial is on [DCYF] and should never be shifted to the parent.' " M.A.S.C., 197 Wn.2d at 698 (quoting D.E., 196 Wn.2d at 103). First, DCYF "must show that it satisfied its statutory obligations under the six elements of RCW 13.34.180(1) by clear, cogent, and convincing

11

evidence." G.C.B, 28 Wn. App. 2d at 171. This standard requires evidence establishing the factors are highly probable. In re Dependency of A.M.F., 23 Wn. App. 2d 135, 141, 514 P.3d 755 (2022), aff'd, 1 Wn. 3d 407, 526, P.3d 32 (2023). "[T]he statutory elements of RCW 13.34.180(1) 'necessarily and implicitly include[] evidence of current parental unfitness,' " but "[t]here is no statutory definition of 'unfitness.' " In re Parental Rights to K.M.M., 186 Wn.2d 466, 490, 379 P.3d 75 (2016) (quoting In re Dependency of K.R., 128 Wn.2d 129, 142, 904 P.2d 1132 (1995)). "A deficiency rises to the level of parental unfitness when it interferes with the parent's ability to provide for the child's basic health, safety, and well-being." Id. at 481. Second, DCYF "must establish that termination of parental rights would be in the child's best interest by a preponderance of the evidence." G.C.B., 28 Wn. App. 2d at 171.

"Our review of a trial court's decision to terminate parental rights is limited to assessing whether substantial evidence supports the court's findings." Id. at 170. " 'Substantial evidence' is 'evidence in sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise.' " Id. at 170-71. "Because of the fact-specific nature of termination proceedings, deference to the trial court is particularly important." Id. at 171. "An appellate court will uphold a finding of fact if substantial evidence exists in the record to support it" and "[s]o long as substantial evidence supports the finding, it does not matter that other evidence may contradict it" as "credibility determinations are left to the trier of fact." In re Marriage of Burrill, 113 Wn. App. 863, 868, 56 P.3d 993 (2002). "In a termination proceeding, the trial court is afforded broad discretion, and its decision

is entitled to great deference on review." J.D.P., 17 Wn. App. 2d 744, 755, 487 P.3d 960 (2021). "The deference paid to a trial judge's advantage in having the witnesses before it is particularly important in termination proceedings because only a trial court can observe a witness's demeanor." Id.

III

M.M. argues that DCYF failed to offer her necessary mental health treatment for PTSD. M.M. argues the superior court therefore erred in finding that "[a]ll necessary services, reasonably available, capable of correcting the parental deficiencies have been expressly and understandably offered."[4] See RCW 13.34.180(1)(d). We disagree.

[N]ecessary services' " are "those services 'needed to address a condition that precludes reunification of the parent and child.' " K.M.M., 186 Wn.2d at 480 (quoting In re Dependency of A.M.M., 182 Wn. App. 776, 793, 332 P.3d 500 (2014)); RCW 13.34.180(1)(d). These "[s]ervices must therefore be tailored to the parent's needs; parents face different challenges and require different assistance." In re Dependency of A.N.C., 24 Wn. App. 2d 408, 416, 520 P.3d 500 (2022), review denied, 1 Wn.3d 1012, 532 P.3d 1014 (2023). "The inquiry is not limited to services ordered by the court during the dependency, but rather [DCYF] must show it offered all necessary available services." In re Parental Rights to I.M.-M., 196 Wn. App. 914, 921, 385 P.3d 268 (2016). "Where . . . the claim is that [DCYF] failed to

---

[4] DCYF urges us to disregard M.M.'s arguments under RAP 10.3(a)(5)-(6), arguing she provided inadequate citations to the record. M.M. provided citations to the record adequate to permit review. The rules of appellate procedure state, "issues will not be determined on the basis of compliance or noncompliance with these rules except in compelling circumstances." RAP 1.2(a).

offer or provide a service, termination is appropriate if the service would not have remedied the parental deficiency in the foreseeable future." In re Parental Rights to D.H., 195 Wn.2d 710, 719, 464 P.3d 215 (2020) (citing RCW 13.34.180(1)(d)).

M.M. argues DCYF "was put on notice of a necessary service it failed to provide . . . as early as March 2021," of MM's "provisional PTSD diagnosis." M.M. argues Dr. Harmon testified "the best method to confirm MM's PTSD diagnosis and determine whether medication management would be appropriate was a referral to a psychiatric assessment." M.M. also relies on M.A.S.C. M.M.'s arguments are contrary to the record and her reliance on M.A.S.C. is inapposite.

Dr. Harmon indicated M.M. "seemed to be showing" "indications, signs" of "PTSD." He said that "common symptoms" of PTSD include "avoidance" among others. He explained a psychiatric assessment to gauge the need for medication, and cognitive behavioral therapy (CBT), could be options to treat PTSD. He indicated facilities like Harborview Abuse and Trauma Center, Compass Health, or Valley Cities "have a mix of clinicians with a mix of different skills" who could respond to a mental health patient's individual needs. But Dr. Harmon did not recommend a psychiatric evaluation for M.M. Instead, he described on cross-examination situations in which one might be appropriate. When asked "[W]ould exploring [M.M.'s medication history] further mean that someone make a referral to a psychiatric assessment for medication management?" Dr. Harmon answered, "That *could* certainly be part of it." (Emphasis added.) Dr. Harmon recommended only that M.M. "connect with—or stay connected to mental health treatment," such as the mental health treatment she was accessing at Sound Integrated Health at

that time. And Dr. Harmon agreed "there were no indications of a serious mental health disorder that would prevent [M.M.] from becoming an effective and appropriate parent." Dr. Harmon's testimony did not support that a psychiatric assessment was a necessary service that DCYF needed to offer.

Further, DCYF referred M.M. to Valley Cities, in line with Dr. Harmon's recommendations for treating potential PTSD. M.M.'s social worker, Liu, offered rides to the facility, which M.M. declined. As Dr. Harmon recommended, DCYF attempted to keep M.M. engaged at Sound Integrated Health, which offered access to mental health services and medication for psychiatric conditions.

In M.A.S.C., the court held, "DCYF did not tailor its offer of services to accommodate [the parent's] intellectual disability." 197 Wn.2d at 688. "[T]here [wa]s no question that DCYF had reason to believe that [the parent] might have an intellectual disability" as multiple providers indicated such an issue and even the "agreed facts" in the "order of dependency" stated the parent was " 'clearly struggling with her cognitive faculties.' " Id. at 700-01. The court held, "[W]here DCYF has reason to believe that a parent may have an intellectual disability, it must make reasonable efforts to ascertain the extent of the disability and how it could interfere with the parent's ability to understand and benefit from DCYF's offer of services." Id. at 699. And if it is revealed the parent has an intellectual disability, "then DCYF must tailor its offer of services to ensure that the offer is reasonably understandable to the parent." Id.

Here, Dr. Harmon made a "provisional" PTSD diagnosis, but did not endorse cognitive barriers. When asked if M.M. "had adequate cognitive ability to

parent the children," Dr. Harmon testified M.M. "showed some subtle areas of weakness, but nothing that would necessarily prevent her from being successful in her chemical dependency or parenting program." While Dr. Harmon noted "some issues with language and verbal reasoning" that would "make it harder to make sure that she understood what she was being asked to learn," he indicated "there wasn't anything in those tests that spoke to say an intellectual disability or an incapacitated learning disability." Dr. Harmon thus agreed "there were no indications of cognitive deficits that would prevent [M.M.] being an effective parent."

Unlike M.A.S.C., the evidence here did not show that M.M. had either a cognitive or mental health need for services to be more particularly tailored in a manner that DCYF failed to meet. Relevant here as to M.M., the superior court's finding that the "parents understood the services that they were required to complete, as demonstrated by the fact that they actually engaged in those services (to a limited degree)" is supported by substantial evidence. The same is true of the superior court's finding that the record does not "indicate[] the need for remedial services for the mother or father other than those set forth above," which included parenting education and substance use treatment. We therefore reject M.M.'s argument that DCYF failed to offer her necessary PTSD treatment or failed to adequately tailor services under M.A.S.C.

IV

J.H. challenges the superior court's findings as to necessary services, his current parental fitness, guardianship, and whether termination was in the best interests of the children.

A

J.H. argues DCYF failed to offer necessary mental health services as "it failed to offer him integrated services despite observing that he was suffering from mental health issues from the untimely death of his adult son." We disagree.

First, DCYF offered J.H. services at facilities that provided substance use treatment and mental health treatment. J.H. attended JOTC for substance use treatment, and it also offers mental health treatment, through either or both a medication prescriber who works with mental health medication and a mental health counselor. According to Timothy Fields, the JOTC counselor who worked with J.H., J.H. reported "upon entering treatment that he had . . . lost a son." Fields explained that JOTC "offer[s] mental health counseling for grief and loss." However, J.H. left the facility despite the attempts of JOTC's staff to change his mind. Liu offered J.H. mental health services at Valley Cities along with transportation to those services, which J.H. declined. Thus, J.H.'s claims that DCYF failed to offer both substance use and mental health treatment or did so "[s]equentially" are without merit.

J.H.'s situation is unlike that in In re Parental Rights to S.J., which addressed a "court order specifically directing mental health services would be sequential to [the parent's] sobriety," 162 Wn. App. 873, 882, 256 P.3d 470 (2011).

Here, DCYF did not direct sequential treatment and referred J.H. to mental health treatment. This matter is also unlike I.M.-M., where "[n]one of [the parent's] service providers testified they were trained to work with cognitively disabled persons" and "no such services were offered." 196 Wn. App. at 922. Here, the record indicates JOTC not only offered mental health treatment, but offered services tailored to grief and loss.

J.H. does not argue, and there was not evidence, that his mental health needs interfered with his ability to understand his treatment requirements in the same way as the "significant cognitive impairment" of the parent in I.M.-M., 196 Wn. App. at 922. J.H. had access to mental health treatment, including services specifically tailored for managing grief, without a sequential restriction. Substantial evidence supports that DCYF offered J.H. all necessary services.

B

J.H. argues there was not substantial evidence supporting a lack of his current fitness as a parent. We disagree.

"A deficiency rises to the level of parental unfitness when it interferes with the parent's ability to provide for the child's basic health, safety, and well-being." K.M.M., 186 Wn.2d at 493. The mere existence of parental deficiencies, such as substance use or mental illness, are "not, in and of [them]sel[ves], proof that a parent is unfit or incapable." In re Dependency of T.L.G., 126 Wn. App. 181, 203, 108 P.3d 156 (2005). The court "must examine the relationship between the . . . condition and parenting ability" and its decision "must be based on current unfitness." Id. The "unfitness inquiry" must "consider the specific parent-child

18

relationship at issue" within the "totality of the[] circumstances." K.M.M., 186 Wn.2d at 493-94.

J.H. argues the "court's finding that [he] has 'not exhibited any behaviors to demonstrate the ability to care for the children' is without support in the record." J.H. relies on the trial return home and his subsequent visits with C.J.H. and P.J.H. as evidence of his parental fitness. While this evidence was supportive of his ability to care for the children, other evidence before the trier of fact supported the superior court's finding. The children's court appointed special advocate (CASA) testified at trial that J.H. "does do generally good visits," but "his drug addiction, . . . goes hand in hand with his inability, or, um, choice not to attend visits on any regular basis, sometimes not seeing his children for months at a time," which "reflects on what his commitment could be on an ongoing, day-to-day basis." Dr. Washington-Harvey explained prior to recommending J.H. complete treatment, "it is difficult to parent when you are not—when you're not clean and sober" and "can often lead to parentifying (phonetic) behavior" for children as they must "take the role of a parent and their own care" even "assum[ing] that and if they're age appropriate to do that."

J.H. argues the "court's finding that [he] had 'no insight into the negative impact of their active use on the children or on their ability to care for the children' is also devoid of factual support." He supports this argument by claiming "[t]here was no evidence of a negative impact of active use on the children" as he "never exposed them to harmful substances or paraphernalia." He claims he "arranged for a responsible caregiver when he used" during the trial return home, or "went

somewhere else to use while the mother or the grandmothers were home with the children."

J.H.'s argument disregards evidence that his continued use would harm the children, providing substantial evidence supporting the challenged finding. Dr. Washington-Harvey testified, "[I]t is difficult to parent when you are not . . . clean and sober" and "the impacts . . . [are] very detrimental to children." She explained this behavior creates "attachment issues" and that "[d]evelopmentally, children can be stinted in their development." Thus, she recommended in her 2021 report that J.H. complete his substance use treatment. Despite Dr. Washington-Harvey's recommendations from 2021 to complete substance use treatment, J.H. admitted to continued drug use at trial. Specifically, J.H. admitted to using drugs for "probably a good part of January [2024]." This included using fentanyl "three to four times a week" and methamphetamines "[p]robably three to four times, maybe five times" in the little over two weeks before trial in January.

J.H. testified his long-term and substance use did not affect his parenting ability. But Liu testified to multiple times where J.H. and M.M. "would report to me that they had started their day and then . . . gone back to sleep in the late morning or that they were having to use substances because they were feeling sick and needing to supplement, . . . and that was impacting their ability to be—to be awake and to be present." Liu tied this concern not only to the general needs of the children, but to "meet[ing] the[] special needs of the children" such as C.J.H.'s ongoing speech therapy services. DCYF social worker Jocelyn Coe testified that C.J.H. and P.J.H. are "three and four" and thus "depend fully on an adult to fulfill

their every need." She testified, "[I]f a parent is using substances, it hinders their ability to safely parent children, specifically children this age," and the parents "have a tendency to consistently focus their behaviors on getting their needs met, which is . . . fulfillment of their addiction." The superior court had substantial evidence from which to find that J.H. lacked insight into the negative impact of substance use on the children and on his ability to care for them.

J.H. next argues, "Substantial evidence does not support the court's finding that the parents' substance use caused removal of the children from their trial return home," arguing as the "court did not remove the children upon first learning the parents had relapsed." Rather, he argues, "[I]t was the parents' failure to get into compliance with services that caused the removal of the children." The court's removal order stated the parents "failed to successfully and substantially complete available services or treatment," which included substance use treatment and for 90-days of clean UAs. There was evidence that the parents relapsed. J.H. testified the children were removed because "we'd gotten a dirty UA. We had relapsed." Liu testified, "[T]he parents were not in compliance with the conditions of the trial return home. They had relapsed . . . and [DCYF] had made numerous attempts to assist the parents in re-engaging with services" but "there was no progress made."

J.H. points to transportation issues as an explanation for his inconsistent visitation schedule. Liu and Coe testified DCYF was aware J.H. lacked a working vehicle at times and had a suspended license. Further, J.H. testified it would take multiple hours by bus to reach visits at certain locations, such as those in Tacoma, WA.

We agree that, when a court considers a parent's failure to visit a child during dependency and termination proceedings, it is appropriate for the court to consider the parent's difficulty in obtaining transportation to the child's residence or a lack of financial or other resources. In re Adoption of Syck, 138 Ill. 2d 255, 278-79, 562 N.E.2d 174 (1990). For "poverty alone is not a sufficient basis for dependency or termination." In re Dependency of G.J.A., 197 Wn.2d 868, 903-04, 489 P.3d 631 (2021). We nevertheless hold that the superior court's analysis of J.H.'s circumstances was appropriate in this case.

The record does not include clear evidence one way or the other on J.H.'s argument on appeal that the frequency of his visitation was driven by DCYF's ending visits at his apartment based on the social worker's concerns, which J.H. disputes, about the suitability of the apartment. Regarding the location of visits, DCYF explained the parents "had concerns about . . . taking the bus to—and being able to get to visits when visits were scheduled in Tacoma." DCYF assisted J.H. by providing ORCA cards and gas vouchers. As for J.H.'s suspended driver's license, DCYF attempted to assist him with requesting documents from the Department of Licensing to identify all his outstanding fees and even sought "potentially to pay for those fees so he could get his license back, if that was the only thing hindering his license." "And because of those concerns, the vast majority of visits were scheduled either . . . at the parental home or the West Seattle visit location or somewhere that was convenient for the parents and not convenient for the children." J.H.'s argument disregards the impact of the visit

locations on the children and efforts to balance and mitigate the impact on both the parents and children.

When considering the "totality of the[] circumstances," K.M.M., 186 Wn.2d at 494, substantial evidence supported the superior court's findings on " 'inconsistent visitation,' " and " 'fulltime parenting requires significantly more commitment to prioritizing and ensuring the children's welfare than occurs during a few visits per month.' " Thus, J.H. fails to demonstrate that the superior court's findings on his current unfitness to parent lacked substantial evidence.

C

J.H. challenges the superior court's finding that it "considered the efforts taken by [DCYF] to support a guardianship and whether a guardianship is available as a permanent option for the children." Further, the court found the children's caregivers "presented multiple reasons for desiring to pursue adoption rather than Guardianship, and a guardianship is not available as a permanent option for the children." J.H. argues the "court's findings of fact do not support the conclusion that the placement was unavailable, and they are devoid of any findings of fact that adoption rather than guardianship is in the best interests of the children." We disagree.

J.H. claims the "placement here was available as a guardian" and a "finding that the placement would rather adopt than participate in a guardianship does not equate to a finding of unavailability." However, "[o]ur courts have long held that [DCYF] need not disprove the availability of a guardianship placement to satisfy its burden under RCW 13.34.180(1)(f)" and "the 2022 amendment to subsection (1)(f)

23

does not create such a burden." G.C.B., 28 Wn. App. 2d at 173. The legislature's use of " 'consider' " within RCW 13.34.180(1)(f) requires "the trial court to consider the viability of guardianship as a factor when assessing whether [DCYF] has" met its burden under RCW 13.34.180(1)(f). G.C.B., 28 Wn. App. 2d at 173. This determination is "a case-specific determination" and "even when an identified guardianship is available, 'there will be circumstances under which termination, rather than guardianship, is the appropriate course of action.' " Id. at 173-74 (quoting In re Welfare of R.H., 176 Wn. App. 419, 429, 309 P.3d 620 (2013)).

J.H.'s argument depends on an overly narrow reading of T.H.'s trial testimony. He cites T.H. answering "[n]o" when asked "if [DCYF] had told you that the plan for [C.J.H.] and [P.J.H.] was guardianship, would you have refused to be a potential guardian?" At most, this questioning indicates T.H. would have pursued guardianship only in a hypothetical situation where DCYF could require it. This court already rejected reliance on a similar line of questioning in In re Dependency of N.B.G., 31 Wn. App. 2d 311, 320, 551 P.3d 1045 (2024), where we noted, "the trial court interpreted her testimony as [the children's caregiver] being willing, not to 'agree,' but to capitulate to serve as a guardian only if compelled, holding that 'the caregiver cannot be coerced to agree to guardianship at the risk of losing placement of the child.' " We said, "[N]othing in the statute requires the trial court to compel [the children's caregiver] serve as a guardian if she does not want to." Id.

In other testimony, T.H. stated she did not want to pursue guardianship. When asked "[a]re you interested in pursuing guardianship rather than adoption?"

24

T.H. answered, "I am not." T.H. testified that she let Liu "know that that was not what we wanted" even after Liu discussed guardianship with her and appeared to prefer "guardianship verse adoption." T.H. explained she declined guardianship due to her own personal experiences with it while growing up and due to a concern about ensuring stability for the children. This court has held similar testimony and considerations were sufficient to establish unviability of a guardianship in N.B.G., 31 Wn. App. 2d at 317-21. We hold the same here.

J.H. next argues the court "failed to find the[] factors" listed within G.C.B. as well as more broadly failed to "find that guardianship was not viable." However, G.C.B. states courts only "should consider" these factors and makes no additional requirement each be specifically found by the court. 28 Wn. App. 2d at 174. Similarly, RCW 13.34.180(1)(f) states a court "must consider" guardianship in determining whether "continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." The statute does not take the additional step of requiring a specific finding beyond stating the court "must consider" guardianship. RCW 13.34.180(1)(f).

We reject J.H.'s arguments that the availability of guardianship precluded termination and that the court's findings were improper.

D

J.H. argues the "[o]verwhelming evidence showed that termination was not in the best interests of [C.J.H.] or [P.J.H.]" and relies on the visits he attended with both children, as well as asserting the children were "bonded" to him and that they were "not harmed by their relationship with their father."

25

The best interests of the child analysis "focuses on whether the parent-child relationship should continue" such that "termination is 'fully justified' . . . when balancing parent's inability to improve versus leaving child 'in limbo . . . for an indefinite period.' " J.D.P., 17 Wn. App. 2d at 760 (last alteration in original) (quoting In re Dependency of A.W., 53 Wn. App. 22, 33, 765 P.2d 307 (1988)). As with the factors within RCW 13.34.180(1), "the trial court is afforded broad discretion, and its decision is entitled to great deference on review." Id. at 755.

J.H.'s reliance on his visits and the lack of harm does not overbear the evidence, described above, that J.H. was not ready to provide full-time care for children the age of C.J.H. and P.J.H. despite his generally positive visits with the children. The superior court acknowledged J.H.'s bond with his children, explaining "this case is really heartbreaking, . . . it's heartbreaking for the children, that they have spent so long in care" and "[i]t really is heartbreaking as to [J.H.]" as "the loss of a child is an unimaginable pain." However, the superior court also noted both C.J.H. and P.J.H. have been in dependency and out of their parents' care for nearly their entire lives, as the parents unsuccessfully attempted to remedy their substance use issues through numerous programs. Dr. Harmon testified, "[I]t's a question . . . of which is the least bad outcome" as "losing your parent is a terrible thing, but perhaps being with a parent who's unstable and exposes you to risk is a worse thing." Liu testified, "[R]emoving the children from [the caregiver's] placement . . . would not have been in their best interest" as "the children have had enough placement changes" and need the "stability" and "consistency" that has been offered by their current caregivers "for almost two and a half years." The

superior court's reasoning was supported by substantial evidence and within its discretion.

Affirmed.

Birk, J.

WE CONCUR:

Coburn, J.